## The Maria Luigia.[1]

### (Circuit Court, E. D. New York. June 29, 1886.)

CHARTER-PARTY—BREACH OF CHARTER—DEVIATION—DAMAGE TO CARGO—ENTRY IN LOG—EVIDENCE—STRESS OF WEATHER.

The charter of a vessel which brought a cargo of green fruit from Messina to New York contained the clause that, "being essentially necessary for the good preservation of the cargo, it is especially agreed that the vessel, on leaving Gibraltar, shall go to the northward of the Western islands, and keep north of that latitude, unless absolutely forced south by stress of weather, in which case the vessel's log-book shall furnish evidence of that fact." It appeared in evidence that the vessel, after leaving Gibraltar, kept the port tack, on a course which would have taken her north of the Western islands, but afterwards changed her tack; and the entry in the log, made at the time, was, "Vessel laboring heavily from high sea;" "on account of heavy sea, take starboard tack;" and on the following day the entry in the log was, "Obliged, from heavy sea, to keep starboard tack, in order not to have the vessel suffer much;" "are compelled, by the rough sea, to keep starboard tacks;" and that, after again attempting to go north on the port tack for six hours, she again headed south, the entry being, "We take the starboard tack, the vessel suffering much on port tack;" and she passed to the southward of the islands. In an action against the bark for damages, held, that she was obliged to take the starboard tack in consequence of her laboring heavily while on the port tack, on account of the high seas, and was absolutely forced south by stress of weather, and that the log-book furnishes evidence of that fact. Held, also, that as the vessel was forced south by stress of weather, and did not pass to the north of the Western islands. it was her duty, under the charter-party, when she reached the western longitude of the islands, in view of the time

---

[1] Reported by R. D. & Wyllys Benedict, Esqs., of the New York bar.

already consumed, and of the perishable nature of the cargo, to make directly for New York, and not to first work up, if she could, to the northerly latitude of the islands. *Held*, also, that the charter-party had been fully performed by the vessel, and that full freight had been earned.

Admiralty Appeal. The decree of the district court in the same case (18 Fed. Rep. 556) reversed.

Two actions—one that of Luigi Pirandello, the charterer, against the vessel, for damages for breach of charter, and the other that of the Fratelli Savarese, owners of the vessel, against the cargo, for balance of freight money—were consolidated and tried together.

In this case the court (BLATCHFORD, Justice) found the following facts:

(1) On December 12, 1880, the Fratelli Savarese were the owners of the bark Maria Luigia, an Italian vessel of 469 tons register.

(2) On that day, at Messina, Sicily, the then master of said bark entered into a charter-party of said bark with Luigi Pirandello, a merchant of Messina, by which it was, among other things, stipulated and agreed that the vessel, then lying at Naples, should proceed to Messina, and load a full and complete cargo of green fruit, or other lawful merchandise, at charterer's option; "the charterer to have the option of shipping brimstone for ballast, and, being so loaded, should therewith proceed direct to New York, Philadelphia, or Baltimore, one port only to be named by the charterer on signing bills of lading; * * * there deliver the same according to bills of lading, on being paid freight * * * at the sum of fourteen hundred gold American dollars in full, if sent to New York, * * * with fifty like dollars gratuity to the captain. The act of God, restraint of princes and rulers, the nation's enemies, fire, and all and every other dangers and accidents of the seas, rivers, and navigation, of whatever nature and kind soever, during the said voyage, always excepted. The freight to be paid in cash on a true and right delivery of the cargo. * * * Being essentially necessary for the good preservation of the cargo, it is especially agreed that the vessel, on leaving Gibraltar, shall go to the northward of the Western islands, and keep north of that latitude, unless absolutely forced south by stress of weather, in which case the vessel's log-book shall furnish evidence of that fact. Twenty-five running days are to be allowed the said merchant (if the ship be not sooner dispatched) for loading, to commence in Messina, when in free *pratique*, and ready to load, and usual time allowed for unloading, according to custom of respective ports. The boxes of fruit to be stowed with the usual ventilation, as customary for the United States. * * * Stevedore to be provided by the charterer, * * * and ten days on demurrage, over and above the said laying days, at twenty-five gold dollars per day." "Penalty for non-performance of all the aforesaid clauses in this charter, amount of freight."

(3) "The Western islands," referred to in the charter-party, are the islands also known as the Azores, and they are geographically situated between the parallels of 39 deg. 45 min. and 36 deg. 57 min. north latitude, and between the meridians of 31 deg. 10 min. and 24 deg. 55 min. longitude west of Greenwich.

(4) That thereafter the vessel, which was lying at Naples, proceeded from there to Messina, where she arrived on January 21, 1881. The master notified the charterer on January 27th that the vessel would be ready to receive cargo under the charter on the next day, and received reply that the vessel's lay days would commence on the 28th.

(5) On February 17, 1881, the vessel began to load brimstone, and finished loading on February 23d, having taken on board 2,600 cantars, equal to 200 tons.

(6) On the fifth of March, 1881, after the expiration of the lay days for loading, the vessel began to load fruit, and finished loading it on the evening of March 9th, having taken on board 1,500 boxes of lemons and 4,766 boxes of oranges. The boxes of fruit were stowed with the usual ventilation, as customary for the United States.

(7) After the loading of the cargo, and on March 9, 1881, the master executed bills of lading for the cargo, which contained, among other things, this provision: "*Ignoro peso e qualita, affermo numero casse, tutt' altro dic' essere.*" They also stated that freight was to be paid "as per charter-party."

(8) The quality of the oranges, when shipped at Messina, was inferior. The weather, at and prior to the shipment, was warm and rainy, and unfavorable for the preservation of fruit, and the keeping quality of the fruit that year was poor.

(9) On March 10, 1881, the vessel sailed from Messina to New York, being tight, staunch, strong, and in every way fitted for the voyage. She passed out of the straits of Gibraltar on April 16, and arrived in New York on May 28, 1881.

[Omitting extracts from the vessel's logs, contained in the tenth and eleventh findings.]

(12) After the bark left Gibraltar she endeavored to go to the northward of the Western islands, and to keep northward of that latitude, and continued so to do until April 18th–19th, on which day she was obliged to take the starboard tack in consequence of her laboring heavily while on the port tack, on account of the high seas, and was absolutely forced south by stress of weather. On the following day she again changed to the port tack, and made another effort, for six hours, to go to the northward of the Western islands, and to keep north of that latitude; but she was again compelled, by stress of weather, to change to the starboard tack, the heavy sea having caused her to suffer heavily, and was absolutely forced south by stress of weather. Thereafter, and until she had passed the longi-

tude of the Western islands, stress of weather made it impossible for her to pass to the northward of them.

(13) The bark's log-book, consisting of the two logs above named, furnishes evidence that for the time above named she was absolutely forced south by stress of weather.

(14) After passing the longitude of the Western islands it would have been imprudent on the part of the master of the bark to take a course which would have then carried her to the northward of the latitude of the Western islands. On the contrary, she was absolutely forced southward of that latitude by stress of weather, and her log-book, consisting of the two logs above named, furnishes evidence of that fact.

(15) Upon the arrival of the bark in New York she made a true and right delivery of her cargo to the consignees thereof, who received and accepted the same.

(16) The charter-party was fully performed by the bark.

(17) The balance of freight money due to the owners of the bark, under the charter-party, after her arrival in New York, and the delivery of her cargo, was the sum of $970.

(18) By reason of the above findings of fact, no facts are found on the subject of any damage to any of the cargo.

And the court also made the following conclusions of law:

(1) The proper construction of the clause in the charter-party, "that the vessel, on leaving Gibraltar, shall go to the northward of the Western islands, and keep north of that latitude, unless absolutely forced south by stress of weather," is that if, by stress of weather, the vessel was prevented from going to the northward of the Western islands, she was not required either to go to the northward of the Western islands, or to keep north of that latitude.

(2) The owners of the bark are entitled to a decree dismissing the libel of Pirandello against her, with costs to them in the district court, and in this court, to be taxed; and adjudging that they recover against her cargo the above-named balance of freight, being $970, with interest from June 21, 1881, with costs in both courts to be taxed.

*Ullo, Ruebsamen & Hubbe*, for libelant.

*Jas. K. Hill, Wing & Shoudy*, (*R. D. Benedict*, counsel,) for claimant of the Maria Luigia.

And the court filed also the following opinion:

BLATCHFORD, Justice. In deciding these cases against the bark and her owners (18 Fed. Rep. 556) the district judge held that the facts stated in the log-book did not prove that the master of the bark was forced by stress of weather to abandon the northern passage. He found that the log-book stated the reason for changing, on April 18th–19th, from the port tack to the starboard tack,—that is, from the northward to the southward course,—to be "to relieve the vessel

from the labor she was subjected to in the high sea running;" and he held that the motive so stated could not have been the real motive, because "the vessel was close-hauled on both the tacks, and the wind and sea continued the same," and "the vessel would therefore labor as much on the starboard as on the port tack," and "changing the tack could not bring relief from the labor." The log shows that at 5 A. M. on the 19th, the wind being W. S. W., and the vessel being able, with that wind, to head N. W., or six points from the wind, she left the port tack, and went on the starboard tack, and headed S., or six points from the wind. From midnight to 4 A. M. the navigation log says: "Vessel laboring heavily from high sea." From 4 A. M. to 8 A. M. that log says: "On account of heavy sea, take starboard tack." On April 19th–20th, from noon to 4 P. M. of the 19th, the navigation log says: "Obliged, from heavy sea, to keep starboard tack, in order not to have the vessel suffer much;" and the general log says: "P. M. Are compelled by the rough sea to keep starboard tacks." At 8 A. M. of the 20th the vessel went on the port tack again, with the wind W. by S., and headed N. W. by N., and in four hours ran fifteen miles, as shown by the navigation log. The general log says: "A. M. At eight o'clock, vessel goes about, and sails on port tacks." On April 20th–21st, from noon to 2 P. M. of the 20th, with the wind W. N. W., the vessel headed N., and ran in the two hours five miles, as the navigation log shows. That log also shows that at 2 P. M., with the same wind, the vessel changed to the starboard tack, the entry being, "At two o'clock we take the starboard tack, the vessel suffering much on port tack;" and that at 3 P. M., with the wind N. W. by N., she headed S. W. by W.

As to the fact whether changing the tack, with the same wind and sea, still remaining close-hauled, will relieve a vessel from labor, the new evidence taken in this court is overwhelming to show that such relief is often given by such change of tack, under the circumstances stated. As, therefore, the reason for the change might be sound, and the motive a real one, and there is nothing to cast suspicion on the good faith of the master of the vessel, the only question is whether suffering from heavy labor in high seas is such "stress of weather" as the charter-party means. Undoubtedly it is. The consequence of the labor might be opening of seams, and leakage, with damage to cargo, or shifting of cargo, and prolongation of the voyage. Much must be left to the sound judgment of the master at the time; and the criticism which is the result of a wisdom which comes after the event, and is easily made by those who were not on the spot, is a poor substitute for the deliberate conclusion of an experienced man, charged with the responsibility of action under the exigencies of the occasion. His log-book shows why he went south, and "furnishes evidence" that he was "absolutely forced south by stress of weather." The preponderance of evidence to outweigh such facts as appear in this case, and the judgment of a competent master upon them, ought to be

very clear. *The Clematis,* Brown, Adm. 502; *The John H. Pearson,* 14 Fed. Rep. 752.

As the vessel was forced south by stress of weather, and did not pass to the north of the Western islands, it was her duty, in view of the time already consumed when she reached the westerly longitude of the islands, and of the perishable nature of the cargo, to make all speed to reach her destination on a direct line, and not to first work up, if she could, to the northerly latitude of the islands. The charter-party did not require that, and good sense and good faith forbade it.

There was no breach of the charter-party, and the whole charter money was earned.